IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CINDY LEWIS, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>SALT LAKE COUNTY (Salt Lake County Sheriff's Office) a body politic; MICHAEL BENDIXON, an individual; and DOUGLAS E. LEWIS, an individual,<br><br>    Defendants. | ORDER AND MEMORANDUM DECISION<br><br><br><br>Case No. 2:03-CV-812 TC |

Plaintiff Cindy Lewis has filed this action under 42 U.S.C. § 1983 against Defendants Salt Lake County, Michael Bendixon, and Douglas E. Lewis. Ms. Lewis claims that Defendants violated her First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendment rights. She also alleges that the Defendants engaged in a conspiracy to deprive her of her civil rights and to obstruct justice. Finally, Ms. Lewis asserts various state causes of action against the Defendants.

The matter is now before the court on the Defendants' motion to dismiss and motion for summary judgment. For the reasons set forth below, Defendants' motions are granted.

# ANALYSIS[1]

## Legal Standards

### Summary Judgment

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

### Qualified Immunity

The qualified immunity doctrine "protects public officials performing discretionary functions unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Johnson v. Martin, 195 F.3d 1208, 1216 (10th Cir. 1999) (internal citations omitted). When a claim of qualified immunity is raised in the context of a motion for summary judgment, the court, viewing the evidence in a light most favorable to the nonmoving party, must first determine whether the plaintiff has sufficiently asserted the violation of a constitutional right. Mimics, Inc. v. Village of Angel Fire, 394 F.3d

---

[1] The factual background of this case is set forth in the pleadings (although the court notes that certain of Plaintiff's factual allegations are unsupported by the record) and therefore, the court will repeat only those facts necessary to explain its decision.

836, 841 (10th Cir. 2005).  Then, if the plaintiff has done so, the court must determine whether the asserted right was clearly established at the time the defendant acted.  Id. at 841-42.

"When evaluating a qualified immunity defense, after identifying the constitutional right allegedly violated, courts must determine whether the conduct was objectively reasonable in light of clearly established law at the time it took place."  Pierce v. Gilchrist, 359 F.3d 1279, 1297 (10th Cir. 2004) (emphasis added).  "Requiring the law to be clearly established provides defendants with 'fair warning' that their conduct is unconstitutional."  Mimics, Inc., 394 F.3d at 842 (quoting Hope v. Pelzer, 536 U.S. 730, 739-40 (2002)).  "The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains."  Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003).  To determine whether a constitutional right is clearly established, the Supreme Court recently noted, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in light of pre-existing law, the unlawfulness must be apparent."  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (emphasis added).  Put another way, the inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional."  Pierce, 359 F.3d at 1298 (emphasis added).

Importantly, the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341, 343 (1986) (citing Harlow v. Fitzgerald, 475 U.S. 800 (1982)).  A

showing of negligence, even if it is gross negligence, is not sufficient to establish liability under 42 U.S.C. § 1983.  Johnson v. Martin, 195 F.3d 1208, 1219 (10th Cir. 1999).

Even on summary judgment, Ms. Lewis bears the burden of establishing that the Defendants violated a constitutional right.[2]

**Ms. Lewis' Claims**

Ms. Lewis' claims are based on two arrests of Ms. Lewis by Defendant Michael Bendixon, a Deputy Salt Lake County Sheriff.  Although Ms. Lewis alleges that she suffered violations of her First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendment rights, it appears that the deciding question is whether Defendants' actions were in violation of the Fourth Amendment.

    A.  The First Arrest

On November 13, 2002, Deputy Bendixon, along with several other deputies, was called to the house in Taylorsville where Cindy Lewis and her husband, Defendant Douglas Lewis, had been living until the time of their separation. The deputies were investigating a complaint that there were trespassers at the house. (Apparently, as a consequence of their divorce proceedings, the Lewises had listed the house for sale.)  Lloyd Dauer, the real estate agent handling the sale, had told Deputy Bendixen that no one should be in the house.  It was Mr. Dauer who made the complaint on November 13 that there were trespassers in the house.

When the deputies knocked at the door of the house, a woman, Susan Tatum, answered.

---

[2] See Jantz v. Muci, 976 F.2d 623, 627 (10th Cir. 1992) ("A defendant government official need only raise the qualified immunity defense to shift the summary judgment burden to the plaintiff.").

Ms. Tatum told the deputies that she was renting the house. She also told the deputies that no one else was in the house, although the deputies could hear voices from inside the house. Ms. Tatum gave the deputies permission to look inside the house.

Deputy Bendixon found Ms. Lewis hiding under a blanket in a storage closet in the garage. He arrested Ms. Lewis and placed her in handcuffs. Deputy Bendixon contends that his arrest of Ms. Lewis was justified for two reasons: he believed that she was trespassing and he was aware that there was an active traffic warrant for Ms. Lewis' arrest. Deputy Bendixon searched Ms. Lewis' purse and her pockets.

Ms. Lewis told Deputy Bendixon that she had obtained a protective order which entitled her to be in the house. She also told him that she was at the house to visit Ms. Tatum to whom she had rented the house.

Ms. Lewis was in handcuffs for approximately twenty minutes. Then, because of booking restrictions at the jail, Deputy Adamson decided to free Ms. Lewis. Deputy Bendixon removed the handcuffs and Deputy Adamson gave her a citation for trespassing. Deputy Bendixon warned her about the traffic warrant. He told her to leave the house, which she did.

Later, Deputy Adamson voided the trespass citation when he learned that Cindy Lewis and her husband were still married. In addition, Deputy Bendixon was unable to give Deputy Adamson a satisfactory reason why Ms. Lewis could not legally be in the house.

Deputy Bendixon's entry into the house was justified under the Fourth Amendment. There is no question that Susan Tatum, who told the deputies that she was renting the house (a claim that was later verified by Cindy Lewis), told the deputies that they could come inside the

house.  See United States v. Matlock, 415 U.S. 164 169-70 (1974) (a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment if the officers have obtained the consent of a third party who possesses common authority over the premises).  The permission is valid even if the third party does not, in fact, possess authority to give consent but the law enforcement officers reasonably believe she does.  See Illinois v. Rodriguez, 497 U.S. 177, 184 (1990).

Deputy Bendixon's arrest, handcuffing, and search of Ms. Lewis' purse did not violate the Fourth Amendment.  First, there is no question that Deputy Bendixon knew that there was an outstanding arrest warrant for Ms. Lewis. (Ms. Lewis does not dispute the existence of the warrant.)  Accordingly, the search of Ms. Lewis' person and her purse was then justified as a "search incident to arrest."  See New York v. Belton, 453 U.S. 454, 461 (1981) (search of jacket on the floor justified as incident to arrest).

Moreover, even though it appears that Deputy Bendixon may have been in error in his belief that Ms. Lewis was trespassing, Supreme Court precedent establishes that he is still entitled to qualified immunity if his mistake was reasonable.

In Anderson v. Creighton, 483 U.S. 635 (1987), the Court held that an F.B.I. agent, who carried out a warrantless search of a home in the mistaken belief that a suspected bank robber was there, was entitled to qualified immunity.  The Court explained that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials–like other officials who act in ways they reasonably believe to be lawful–should not be held personally liable." Id. at 641

(citation omitted).

The Court, in a later case, expanded the holding in <u>Anderson</u> to a claim of excessive force.  In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Court granted qualified immunity to a military police officer accused of using excessive force when he arrested a person who was attending a speech given by then Vice-President Albert Gore.  Although it later appeared that the officer may have used more force than necessary when making the arrest, the Court found that "[a] reasonable officer in petitioner's position could have believed that hurrying respondent away from the scene, where the Vice President was speaking and respondent had just approached the fence designated to separate the public from the speakers, was within the bounds of appropriate police responses." <u>Id</u>. at 208.

The Court noted that

> Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the constitution.  Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, <u>Anderson</u> still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

<u>Id.</u> at 206.

Here, the record shows that Deputy Bendixon's belief that Ms. Lewis was trespassing, even if mistaken, was reasonable.  He had received information from the real estate agent that no one was to be in the house. He knew that the utilities had been discontinued.  He knew that the deputies had been called to the house to investigate a charge of trespass.  All this information gave Deputy Bendixon a reasonable basis to arrest Ms. Lewis for trespass.

B. <u>The Second Arrest</u>

In December 2002, a federal warrant had been issued for the arrest of Ms. Lewis. On December 10, 2002, Deputy Bendixon arrested Ms. Lewis, who was standing outside the ZCMI Center in Salt Lake City, on the federal warrant. Deputy Bendixon placed Ms. Lewis in handcuffs and shoved her into the front seat of his patrol car. (He had searched her pockets and taken her purse before he put her into his patrol car.) Deputy Bendixen left Ms. Lewis in his patrol car while he went to the back of the car to search her purse. There is no dispute that Ms. Lewis slipped one hand out from the cuffs and reached over the console of the patrol car towards the ignition. Sherilyn Mills was a "ride along" passenger from a neighborhood watch group who was with Deputy Bendixen and witnessed the events. Ms. Mills told Deputy Bendixen that Ms. Lewis had slipped one hand from the handcuffs. Both Deputy Bendixen and Ms. Mills heard a noise like an engine makes when the ignition key is turned while the engine is running. Deputy Bendixen ran to the driver's side of the car and opened the door with his spare key. He grabbed Ms. Lewis by the hair, swore at her, shoved her head against the window, grabbed her by the arm and removed her from the car. He then re-cuffed her, put her back into the patrol car, and took her to the Salt Lake County Jail.

There is no question that Deputy Bendixen's arrest of Ms. Lewis and the search of her pockets and purse did not violate the Fourth Amendment. As discussed above, an arrest, when done pursuant to a valid warrant is lawful. The search of Ms. Lewis was justified as a search incident to arrest. Ms. Lewis claims that Deputy Bendixen used excessive force when he initially arrested her, and then when he restrained her after she had removed her hand from the handcuffs.

Ms. Lewis gave these descriptions of her initial arrest by Deputy Bendixen: "When he put the cuffs on me, he threw me in the front seat of the squad car." (Dep. of Cindy Lewis at 83.) "[H]e threw me in the front seat of his squad car. He told me to shut the fuck up." (Id. at 88.) "He shoved me in the front seat of the squad car. He had the door open and he shoved me in." (Id. at 89.) "He handcuffed me, he opened the passenger door and shoved me in the door, shoved me in the seat." (Id. at 93.) "He grabbed my arms, he handcuffed me, he grabbed my arms and shoved me into the squad car in the front seat of the squad car." (Id.) "He told me to get in, and he shoved me into the front seat of the squad car." (Id. at 94.) In response to a question whether Deputy Bendixen "physically injured" Ms. Lewis when he arrested her, Ms. Lewis answered, "Not at that moment, no." (Id. at 95.)

Ms. Lewis described the events after she had removed her hand from the handcuffs as follows: "I was trying to find the heater knob to turn up the heat. And when he saw me–he saw–he saw me reaching and he came flying over, opened the driver's side of the door, grabs me, shoves my head against the windshield, comes back over to the driver's side, pulls me over the car[.]" (Id. at 103.) She continued her description:

> The first thing that he does, he opens the door, grabs my hair, calls me a fucking bitch, shoves my head against the window, grabs his keys, comes back over to the passenger side, grabs me, yanks me out of the car, puts the cuffs on, throws me back in the front seat, shuts the door. That's what I remember.

(Id. at 109.)

She testified that "he smacked" her head against the side window once. (Id. at 110.) She said that her head "hurt." (Id.) She testified that she didn't know if there was a bruise on her head, she didn't think that her head was bleeding, but that "I just know that it hurt very badly."

9

(Id. at 120.)  She felt "nauseous." (Id.)  Later, when questioned at a continuation of her deposition, Ms. Lewis repeated her description of Deputy Bendixen's actions in calling her a "stupid fucking bitch," grabbing her by the hair, and her head hitting the window. (Id. at 162.) Apparently, Ms. Lewis did not request or receive any medical attention as a result of Deputy Bendixen's actions.

Did Deputy Bendixen Use Excessive Force?

The Supreme Court noted that "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989) (citations omitted).  The Court further instructed that a court, in evaluating the reasonableness of a particular arrest or stop, must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citations omitted).  The Court stated that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

In Holland v. Harrington, 268 F.3d 1179 (10th Cir. 2001), the Tenth Circuit discussed the Supreme Court's excessive force teachings. Cautioning that a district court must consider the totality of the circumstances when a claim of excessive force has been made, the court stated:

> While "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. 1865, "[p]ushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness." <u>Saucier</u>, 121 S. Ct. at 2160.  The whole course of conduct of an officer in making an arrest or other seizure–including verbal exchanges with a subject–must be evaluated for Fourth Amendment reasonableness in light of the totality of the circumstances.

<u>Id.</u> at 1194.  There is little doubt that Deputy Bendixen reasonably believed that Ms. Lewis was attempting to escape.  While it is not clear whether Ms. Lewis could have posed a threat had she been successful in escaping in Deputy Bendixen's patrol car, the prospect of Ms. Lewis driving in downtown Salt Lake City, partially handcuffed, seated in the passenger seat (or attempting to move into the driver's side), while attempting to evade officers, would be cause for alarm.

When these considerations are weighed against the force that Ms. Lewis claims was used against her, a shove, push (which caused her head to strike the window), hairpulling, and a curse, the court concludes that the force was not excessive.  The court's conclusion is strengthened by the fact that Ms. Lewis did not seek medical help and apparently did not sustain any cuts or bruises.

### Malicious Prosecution

Ms. Lewis appears to be asserting a claim for malicious prosecution based on the charge that was subsequently filed against her for Escape from Official Custody, a third degree felony under Utah law. <u>See</u> Utah Code Ann. § 76-8-309 (2004).  Following a preliminary hearing on the escape charge, a state trial judge found probable cause existed to have Ms. Lewis bound over for trial.  Later, another state trial judge dismissed the case.

The Tenth Circuit recognizes a cause of action under § 1983 for malicious prosecution.

11

But the Court has made clear that such a claim is not the same as a claim for the state law tort of malicious prosecution.  In Pierce v. Gilchrist, 359 F,3d 1279 (10th Cir. 2004), the court noted that in a § 1983 claim, the "'ultimate question' is the existence of a constitutional violation." Id. at 1290 (citations omitted).  Importantly, the court found that a plaintiff need not satisfy "the requirements of an analogous common law tort" to state an actionable claim under § 1983.  Id.

Ms. Lewis does not contend, and the record would not support such a contention, that Deputy Bendixen gave false information to the prosecutors in connection with the prosecution. Indeed, the evidence before the court indicates that Deputy Bendixen had more than probable cause to believe that Ms. Lewis was attempting to escape. (Neither party has submitted evidence to explain why the case was ultimately dismissed.)  Therefore, the court concludes that Ms. Lewis has failed to establish that Deputy Bendixen violated her constitutional rights in connection with the escape charge and prosecution.

### C. Ms. Lewis' Conspiracy Claim

Ms. Lewis has asserted claims that Defendants conspired to violate her civil rights in violation of 42 U.S.C. § 1985(2) and § 1985(3).  There is nothing in the record that supports a claim under either provision of the statute.  Section 1985(2) prohibits conspiracies to interfere with court proceedings. Kush v. Rutledge, 460 U.S. 719 (1983).  Section 1985(3) requires proof that a conspirator's actions were motivated by class-based, invidiously discriminatory animus. Dixon v. City of Lawton, 898 F.2d 1443, 1447 (10th Cir. 1990).  Neither type of conspiracy is at issue in this case.

## ORDER

For the reasons set forth above:

1.  Defendants' Motions for Summary Judgment (Docket Nos. 20 and 24) are GRANTED as to Plaintiff's federal claims.

2.  Pursuant to 28 U.S.C. § 1367(c)(3), the court declines to exercise supplemental jurisdiction over the state law claims.

3.  All other motions in this case are DENIED as moot.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge